UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMI TREASTER,                    :    **CIVIL NO. 4:09-CV-00632**
                                  :
            Plaintiff             :    (Judge Jones)
                                  :
        v.                        :    (Magistrate Judge Smyser)
                                  :
CONESTOGA WOOD SPECIALTIES,       :
CORP.,                            :
                                  :
            Defendant             :

## REPORT AND RECOMMENDATION

I. Background and Procedural History.

The plaintiff, Tami Treaster, commenced this action by filing a complaint on April 7, 2009. On October 1, 2009, the plaintiff filed an amended complaint. The defendant is Conestoga Wood Specialties Corp., the plaintiff's former employer.

The amended complaint contains ten counts. Count I is a Title VII hostile work environment claim. Count II is a Title VII retaliation claim. Counts III and IV are

interference and retaliation claims under the Family and
Medical Leave Act (FMLA).  Counts V and VI are disability
discrimination claims under the Americans with Disabilities Act
(ADA).  Count VII is a retaliation claim under the ADA.  Counts
VIII and IX and disability discrimination claims under the
Pennsylvania Human Relations Act (PHRA).  Count X is a
retaliation claim under the PHRA.

On October 6, 2009, the defendant filed an answer to
the amended complaint.  The discovery period closed on December
15, 2009.

On January 19, 2010, the defendant filed a motion for
summary judgment, a brief and documents in support of its
motion.  The defendant also filed a document entitled
"Defendant's Proposed Findings of Fact and Conclusions of Law."
Given that the court does not find facts in connection with
deciding a summary judgment motion, proposed findings of fact
and conclusions of law are not appropriate in connection with a
motion for summary judgment.  We construe the defendant's

2

proposed findings of facts as the defendant's Local Rule 56.1 statement of undisputed material facts.

The plaintiff construed the defendant's proposed findings of facts as a statement of undisputed material facts. After requesting and receiving an extension of time, the plaintiff filed a response to the defendant's statement of undisputed material facts, a counter statement of undisputed facts, a brief and documents in opposition to the motion for summary judgment.

On February 18, 2010, Judge Jones referred the defendant's motion for summary judgment to the undersigned.

The defendant requested and received an extension of time to file a reply brief. On March 16, 2010, the defendant filed a reply brief, a response to the plaintiff's counter statement of undisputed facts and additional documents. With leave of court, the plaintiff filed a sur-reply brief and additional documents.

II. Summary Judgment Standards.

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'-- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must "set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

4

A material factual dispute is a dispute as to a factual issue the determination of which will affect the outcome of the trial under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Summary judgment is not appropriate when there is a genuine dispute about a material fact. *Id.* at 248. A dispute as to an issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249-50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving

5

party.  *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d
Cir. 1988).

At the summary judgment stage, the judge's function is
not to weigh the evidence and determine the truth of the
matter, but is to determine whether there is a genuine issue
for trial. *Anderson, supra,* 477 U.S. at 249.  The proper
inquiry of the court in connection with a motion for summary
judgement "is the threshold inquiry of determining whether
there is the need for a trial - whether, in other words, there
are any genuine factual issues that properly can be resolved
only by a finder of fact because they may reasonably be
resolved in favor of either party." *Id.* at 250.

"[T]he plain language of Rule 56(c) mandates the entry
of summary judgment, after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient
to establish the existence of an element essential to that
party's case, and on which that party will bear the burden of
proof at trial." *Celotex, supra*, 477 U.S. at 322.  "Under such
circumstances, 'there can be no genuine issue as to any

6

material fact, since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily

renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297

F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S.

at 323).

III.  Material Facts.

        Given that in deciding a summary judgment motion, the

court must consider all evidence in the light most favorable to

the non-moving party, the following facts are either undisputed

or are the plaintiff's version of the facts.[1]

_____

1.  The defendant's statement of material facts consist of 267
paragraphs, and the plaintiff's counterstatement of undisputed
facts consist of an additional 198 paragraphs.  We summarize only
those facts that are material to deciding the issues raised in
connection with the defendant's summary judgment motion and such
additional background facts as necessary to give context to the
material facts.  We have not included in the material facts
summarized here factual statements cited by the parties where the
citation to the record does not support those statements. We note
in that regard, however, that we do not accept the defendant's
contention that those factual statements set forth by the
plaintiff and supported only by the plaintiff's deposition
testimony are without evidentiary support.  The plaintiff's
deposition testimony is, of course, evidentiary support.

The Plaintiff's Employment.

The plaintiff was hired by the defendant in November of 2005 at its facility in Beaver Springs, Pennsylvania. *Doc. 27 at ¶1 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶1 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Upon commencement of her employment with the defendant, the plaintiff was provided with an Employee Handbook and she went through orientation. *Id. at ¶2.* As part of her orientation, the plaintiff was required to review the defendant's sexual harassment policy and its attendance policy and point system. *Id. at ¶3.* The plaintiff was required to sign an acknowledgment of receipt of the handbook wherein she agreed to read the handbook and to comply with the information contained in the handbook. *Id. at ¶4.* The handbook included an EEO policy, harassment policy, attendance policy, progressive discipline policy, FMLA policy and a dispute resolution procedure. *Id. at ¶5.*

The plaintiff worked for the defendant in various positions including as a saw operator, framing processor and

8

double end equalizer. *Doc. 31 at ¶2 of Plaintiff's Counter Statement of Undisputed Facts.* The defendant routinely moved employees to different jobs around the plant which required employees to work with different co-workers. *Doc. 27 at ¶12 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶12 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* The plaintiff routinely asked to be moved to many different positions and machines because she wanted to learn different jobs in the plant. *Id. at ¶13.*

The plaintiff started her employment for the defendant on the first shift, but she was transferred approximately a year later to the third shift. *Id. at ¶10.* During her employment on the third shift, the plaintiff was supervised by Stephanie Blewett, who was employed as a coordinator, and Larry Kauffman, who was employed as a team leader. *Doc. 31 at ¶¶7-9 of Plaintiff's Counter Statement of Undisputed Facts.* Blewett was responsible for overseeing employees in the assembly department and for ensuring that the work was being completed. *Id. at ¶10.* Blewett reported to Kauffman. *Id. at ¶11.* As the

team leader, Kauffman reported to George Camp, the defendant's production manager. *Id. at ¶12.*

At the relevant times, Richard O'Neill was the defendant's plant manager and Robyn Long was the defendant's Human Resources Manager. *See Doc. 27 at ¶25 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶25 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.*

The plaintiff cared for her father, ill mother and two young children while regularly working 12-hour shifts five days a week plus an 8-hour shift on one of her days off during the workweek. *Id. at ¶262.*

The Plaintiff's Panic Disorder.

Dr. Sharon Galvin, a medical doctor with Geisinger Medical Center, began treating the plaintiff in March of 2006. *Doc. 32-27 at ¶8.* During her treatment of the plaintiff, Dr. Galvin learned that the plaintiff was experiencing panic

10

attacks, stress and anxiety. *Id. at ¶9.*  In October of 2007,
Dr. Galvin diagnosed the plaintiff with panic disorder, which
is a mental illness that can involve stress, anxiety and/or
panic attacks. *Id. at ¶10.*  Dr. Galvin continues to treat the
plaintiff for panic disorder and other medical-related issues.
*Id. at ¶11.*

During her treatment of the plaintiff, Dr. Galvin
concluded that the plaintiff's panic disorder affected the
plaintiff's daily functioning including but not limited to her
ability to sleep, concentrate, focus and interact with others.
*Id. at ¶12.*  In treating the plaintiff for panic disorder, Dr.
Galvin met with the plaintiff and permitted her to speak about
her stress and anxiety. *Id. at ¶13.*  Dr. Galvin also prescribed
the plaintiff medication including Trazodone, Ativan and
Celexa. *Id.*

The plaintiff was compliant with Dr. Galvin's
professional recommendations regarding treating her panic
disorder. *Id. at ¶14.*  Nevertheless, even during the time that
the plaintiff was taking medication to treat her panic

11

disorder, she experienced stress, anxiety and panic attacks.
*Id. at ¶15.*

When she is having a panic attack, the plaintiff feels
like her heart is beating out of her chest, her legs start
moving, she starts to shake and sometimes she sweats. *Doc. 31
at ¶173 of Plaintiff's Counter Statement of Undisputed Facts*.
She feels depressed and just wants to sleep. *Id. at ¶174.* When
she is having a panic attack, the plaintiff walks in circles,
she shakes and can't sit still, she rocks back and forth, she
talks in circles and rambles, she breathes rapidly and,
although she can hear, she can not always comprehend what is
being said to her. *Doc. 32-4 at 79-80 (pages 177-78 of Treaster
Dep.).* However, the plaintiff can work and drive. *Id.* When
she first starting having panic attacks, they would last about
ten minutes. *Id.* Lately, however, they last only a minute or
two. *Id.*

Prior to making complaints of sexual harassment, the
plaintiff informed Blewett that she was suffering from a panic
disorder. *Doc. 31 at ¶159 of Plaintiff's Counter Statement of*

12

*Undisputed Facts.*[2]  The plaintiff also informed Blewett on more than one occasion that she was depressed. *Id. at ¶160.*  She also informed Blewett that she was suffering from anxiety. *Id. at ¶161.*  Blewett observed the plaintiff cry at work and concluded that the plaintiff's crying at work was a problem. *Id. at ¶162.*  When she witnessed the plaintiff crying, Blewett would inform Kauffman and they would take the plaintiff off the floor to allow her to gather herself. *Id. at ¶161.*

At some point during her employment, the plaintiff approached Kauffman and said that she wanted an agreement with him that if she felt like she was going to have a nervous breakdown at work she could go home. *Doc. 27 at ¶224 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶224 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.*  She informed Kauffman that she was suffering from anxiety and panic attacks. *Doc. 31 at ¶164 of Plaintiff's*

---

2.  In support of this assertion and the rest of the assertions in this paragraph the plaintiff relies on deposition testimony of Blewett.  The pages of Blewett's deposition testimony cited by the plaintiff were not filed by the plaintiff.  However, such pages are part of the materials submitted by the defendant. *See Doc. 39-2 at 12-13.*

*Counter Statement of Undisputed Facts.* Kauffman advised her that he did not have the authority to authorize such an agreement and he told her to go to Human Resources to see if she needed FMLA. *Doc. 27 at ¶225 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶225 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts*. Kauffman had no knowledge as to whether the plaintiff sought any mental health treatment during her employment. *Id. at ¶258.* Kauffman never advised anyone in Human Resources regarding this conversation with the plaintiff and he never followed up with the plaintiff to determine if she had obtained FMLA documents. *Id. at ¶226.*

Rumors about the Plaintiff.

Beginning in January of 2008, rumors were circulating in the workplace about the plaintiff. *Doc. 31 at ¶26 of Plaintiff's Counter Statement of Undisputed Facts.* The plaintiff believed that the rumors were started by Christine Shelley, a nonsupervisory co-worker of the plaintiff on the third shift. *Doc. 27 at ¶29 of Defendant's Proposed Findings of*

14

*Fact and Doc. 31 at ¶29 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.*

Some of the rumors involved the plaintiff and Calvin Knepp, another nonsupervisory co-worker of the plaintiff on the third shift. *Id. at ¶30.* On occasion, Knepp had driven the plaintiff to and from work. *Id. at ¶31.* According to the rumors, the plaintiff and Knepp were having an affair. *Id. at ¶32.* More specifically, there was a rumor that on one occasion the plaintiff and Knepp had a "quickie" on the way to the emergency room. *Id. at ¶12.* There were also a rumor that the plaintiff and Knepp were having rough sex outside of work and that they needed to buy a padded headboard so that the plaintiff did not get headaches. *Id. at ¶12.* After Knepp took another co-worker, Shirley Corson, home during a snow storm, a rumor started that he was having sex with Corson. *Id. at ¶37.*

One of the rumors involved the plaintiff and Rachel Harkleroad. *Id. at ¶33.* Harkleoad was a nonsupervisory co-worker of the plaintiff with whom the plaintiff resided. *Id.* The rumor was that the plaintiff and Harkleroad were involved

in a lesbian relationship. *Id.*  The plaintiff told Harkleroad about the rumor. *Id. at ¶34.*  Harkleroad told the plaintiff that she was not bothered by the rumor and that the plaintiff should not be bothered by it either. *Id. at ¶35.*

Another rumor was that the plaintiff and Ron Jury, a co-worker of the plaintiff, were having an affair. *Doc. 32-3 at 98 (Treaster Dep. at 97).*

The plaintiff was upset and offended by the rumors and wanted them to stop. *Doc. 31 at ¶39 of Plaintiff's Counter Statement of Undisputed Facts.*

The Plaintiff's Complaints about the Rumors.

In late January or early February of 2008, the plaintiff complained to Blewett about the rumors involving her and Knepp. *Doc. 32-3 at 89 (page 88 of Treaster Dep.).*  The plaintiff subsequently complained to both Blewett and Kauffman that she was being called a lesbian. *Doc. 31 at ¶34 of Plaintiff's Counter Statement of Undisputed Facts.*  She further

16

complained to Blewett about the rumors involving Ron Jury. *Doc. 32-4 at 10 (page 108 of Treaster Dep.).* Blewett did not inform the Human Resources Department of the plaintiff's complaints. *Doc. 31 at ¶¶32 & 158 of Plaintiff's Counter Statement of Undisputed Facts.*

In or about late February or early March of 2008, the plaintiff complained to Blewett and Kauffman about rumors in the workplace. *Doc. 27 at ¶28 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶28 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Kauffman admits that the plaintiff complained about sexual harassment to him regarding the rumors and comments. *Doc. 31 at ¶35 of Plaintiff's Counter Statement of Undisputed Facts.*

Shelley's Complaints Against the Plaintiff.

Shelley also complained to Kauffman about the plaintiff. *Doc. 27 at ¶38 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶38 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Shelley complained

17

that the plaintiff had accosted her at the time clock and had followed her to the lunch room. *Id. at ¶39.* Shelley also complained that the plaintiff had started a rumor that Shelley was the defendant's doorknob and "every one takes a turn." *Id. at ¶40.*

<u>February Absences</u>.

On February 16, 2008, the plaintiff was absent from work and issued an occurrence under the attendance policy for that absence. *Doc. 27 at ¶234 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶234 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* The plaintiff objected to the issuance of the occurrence since she claimed that she was absent to attend a non-refundable stress management class. *Id. at ¶235.*

On February 21, 2008, the plaintiff communicated with Dr. Galvin that she was having difficulty sleeping due to panic attacks. *Doc. 32-27 at ¶16.* Dr. Galvin concluded that the plaintiff was experiencing sleep difficulties at least in part

because of her panic disorder. *Id. at ¶17.* As a result, Dr. Galvin excused the plaintiff from work from February 21-22, 2008 due to her panic disorder. *Id. at ¶18.* The note written by Dr. Galvin provided: "Please excuse from work 2/21/08 – 2/22/08 due to illness." *Doc. 32-28 at 2.* In using the term "illness," Dr. Galvin was referring to the plaintiff's panic disorder. *Doc. 32-27 at ¶20.*

On or about February 22, 2008, the plaintiff was absent from work. *Doc. 27 at ¶237 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶237 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* She returned to work with the note from Dr. Galvin excusing her from work that day because of "illness." *Id. at ¶238.* Kauffman met with the plaintiff on February 29th to advise her that she was receiving an occurrence under the attendance policy and a written coaching memo due to the number of points that she had accumulated under the attendance policy. *Id. at ¶239.* Kauffman advised the plaintiff to watch her attendance since she had 4 3/4 occurrences and nine occurrences was the limit. *Id. at ¶240.* The plaintiff informed Kauffman that she had anxiety and

19

depression and that the medications that she was taking to try to regulate those conditions could cause drowsiness. *Doc. 32-4 at 45 (page 143 of Treaster Dep.).* Kauffman told the plaintiff that the doctor's excuse would not suffice to excuse her absence. *Doc. 31 at ¶184 of Plaintiff's Counter Statement of Undisputed Facts.* On the coaching memo, the plaintiff indicated that she disagreed with the discipline and wrote: "Doctor's excuse, if you want I will get a FMLA." *Id. at ¶187.*

After Kauffman received the plaintiff's medical note, he turned the note and attendance documents into the time keeper. *Doc. 27 at ¶243 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶243 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* He did not have any discussions with anyone in Human Resources to let them know that he had received the medical note. *Id. at ¶244.* The defendant did not designate the plaintiff's February 22, 2008 absence as an FMLA absence. *Doc. 31 at ¶190 of Plaintiff's Counter Statement of Undisputed Facts.*

On March 5, 2008, the plaintiff went to Human Resources Assistant Cynthia Fultz and obtained FMLA paperwork. *Doc. 27 at ¶245 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶245 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* That same day, Fultz sent an email to Long which provides: "I gave Tami FMLA paperwork. She is having issues with her medical condition due to working 12 hours a day. Just an FYI." *Doc. 32-29 at 2.* The plaintiff never returned the FMLA form to the defendant. *Doc. 27 at ¶247 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶247 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* She also never provided her physician with the FMLA form. *Id. at ¶248.*

Neither Camp nor O'Neill were aware that the plaintiff had picked up FMLA paperwork, that the plaintiff had any type of medical condition or that the plaintiff requested any type of leave. *Id. at ¶254.*

D. <u>Meetings</u>.

Kauffman had three separate meetings with all of the third shift employees at which they were all warned to stop the rumor-mongering. *Id. at ¶54.*[3]  Kauffman also sat in the break room on several occasions to monitor employee behavior because he believed much of the inappropriate activity was occurring there. *Id. at ¶55.*  While Kauffman was present, there were no incidents of such misbehavior. *Id. at ¶56.*

On Monday, March 3rd, Kauffman brought the plaintiff and Shelley into the conference room to discuss their issues and address the rumors. *Id. at ¶41.*  Blewett was also in attendance during this meeting. *Id. at ¶42.*  The purpose of the meeting was to review the allegations made by both the plaintiff and Shelley and to attempt to resolve the issues by defining the

---

3.  The plaintiff denies this statement from the defendant's statement of material facts.  The plaintiff cites to a page from her deposition in support of her denial.  However, the cited page does not support the denial.  Accordingly, we deem this fact undisputed for purposes of the instant summary judgment motion.

defendant's expectations and the plaintiff and Shelley's behavior going forward. *Id. at ¶43.*

At the meeting, the plaintiff denied Shelley's allegations and accused Shelley of spreading rumors about her. *Id. at ¶¶45 & 46.* Shelley denied that she had started any rumors about the plaintiff and stated that she wanted the situation with the plaintiff to be over. *Id. at ¶¶47 & 49.* The plaintiff asked for an apology from Shelley. *Doc. 31 at ¶46 of Plaintiff's Counter Statement of Undisputed Facts.* The plaintiff was told that the parties had to agree that everything was resolved before they could leave the meeting. *Id. at ¶47.* The plaintiff did not receive an apology and did not feel that the situation was resolved. *Id. at ¶48.* The plaintiff was told that she must stay away from Shelley and that she must not sit near Shelley in the break room. *Id. at ¶44 & 45.* At the end of this meeting, the plaintiff and Shelley were sent back to work. *Id. at ¶51.*

When production manager George Camp arrived at work that morning, Kauffman told him about the plaintiff and

Shelly's allegations against each other. *Doc. 27 at ¶51 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶51 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Because the defendant frequently moves employees around during a shift, Camp told Kauffman to make sure that the plaintiff and Shelley did not work together. *Id. at ¶52.*

Shortly after the initial meeting on March 3, 2008, Camp met with Kauffman, the plaintiff, Knepp and Shelley. *Id. at ¶57.* It was readily apparent to Camp that the plaintiff and Shelley each had a hostile attitude towards the other. *Id. at ¶58.* Camp believed that neither of them at that point could back up her claims against the other. *Id. at ¶60.* Camp told both of them that the defendant would continue to investigate their complaints but would not tolerate the type of behavior about which each was accusing the other. *Id. at ¶62.*

After the meeting, Camp relayed the information that he had learned to Long for her to continue the investigation. *Id. at ¶65.*

24

Telephone Conversations with Long.

On March 5, 2008, Long separately telephoned the plaintiff and Shelley. *Id. at ¶66.* The plaintiff told Long that she was the victim, that she had been sexually harassed and that the defendant's treatment of her was unfair and was creating a hostile work environment. *Doc. 31 at ¶54 of Plaintiff's Counter Statement of Undisputed Facts.* She also told Long that she was being called a slut and lesbian and that her co-workers were ignoring her. *Id. at ¶55.* She told Long that she does not like being made to look like a fool, especially since she is the one who had initiated the sexual harassment complaint. *Id. at ¶56.* The plaintiff informed Long that she had complained to Kauffman and Blewett several times about the sexual comments. *Id. at ¶57.* In response, Long stated that "this is the first time I'm hearing any of this." *Id. at ¶58.*

The plaintiff told Long that during the meeting with Kauffman, Blewett and Shelley, Kauffman wanted the plaintiff and Shelley to talk things out. *Doc. 27 at ¶73 & 74 of*

*Defendant's Proposed Findings of Fact and Doc. 31 at ¶73 & 74 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* The plaintiff told Long that Kauffman had advised both her and Shelley that the behavior was to stop immediately and he had explained his expectations going forward. *Id. at ¶75.* The plaintiff also explained to Long that she had been called in to talk to Camp. *Id. at ¶78.* The plaintiff told Long that Camp had told her and Shelley that the behavior would not be tolerated, must be stopped and that they were not to aggravate each other. *Id. at ¶80.*

Long asked the plaintiff for the names of the individuals who had actually heard Shelley spread the rumors. *Id. at ¶85.* The plaintiff told Long that her co-workers Ethel Adams and Ron Jury had heard Shelley spreading the rumors. *Id. at ¶86.* Long spoke with Adams and Jury individually. *Id. at ¶87.* Neither Adams nor Jury confirmed that Shelley was the source of the rumors or that she was repeating the rumors. *Id. at ¶88.*

On March 5th, Long also telephoned Shelley to hear her side of the story. *Id. at ¶90.* Shelley told Long that in January the plaintiff had confronted her and told her to mind her own business, to just worry about her own work and to stop her bitching. *Id. at ¶91.* Shelley told Long that she did not know what the plaintiff had been talking about. *Id. at ¶92.* Shelley also told Long that on the Sunday night shift, the plaintiff had confronted her three times (twice at her locker and once in the lunchroom) saying "If you have something to say to me say it to my damn face." *Id. at ¶94.* Shelley also told Long that the plaintiff told her that she had better knock it off or she would "get her for harassment." *Id. at ¶95.* Shelley told Long that the plaintiff followed her out the door and kept repeating those statements. *Id. at ¶96.* Shelley told Long that on the Monday night shift she had told Kauffman about her confrontation with the plaintiff and had told him to do something about the plaintiff. *Id. at ¶97.*

Shelley told Long that Kauffman had said that he would handle it right then and that he had called the plaintiff and Blewett into the conference room. *Id. at ¶¶98-99.* Shelley told

27

Long that Kauffman had told both the plaintiff and her that the conflict needed to be settled and resolved. *Id. at ¶107.* Shelley also told Long about the meeting with Camp and that Camp had told her and the plaintiff that all conflicts were to stop and must not happen again. *Id. at ¶¶113-114.*

Camp's March 6th Meeting with Shelley.

The next day, the morning of March 6th, Camp met again with Shelley in his office. *Id. at ¶122.* Camp directed Shelley not to participate or involve herself with the plaintiff and not to spread false or malicious rumors. *Id. at ¶127.* Camp also instructed Shelley, if she were to hear any rumor or were threatened, to go to a supervisor or coordinator about the issue. *Id.* Camp also warned Shelley that the conduct of which she was being accused, if true, would be grounds for terminating her employment. *Id. at ¶128.*

28

<u>Counseling Memos</u>.

Long met with Camp and they decided that Long would prepare identical counseling memos that were to be issued to the plaintiff and to Shelley to address their ongoing personality clash and to reinforce the outcome of the previous meetings with both of them. *Id. at ¶133.* The memos required the plaintiff and Shelley to agree that they would maintain a professional work attitude, be respectful of co-workers, speak to co-workers in a respectful manner, immediately stop talking about co-workers in a negative manner and inform Kauffman if they were to witness or to be affected by rumors or negative behaviors. *Id. at ¶134.* The memos further advised the plaintiff and Shelley that "if there are any further incidents such as this or any other company policy violations, this will result in disciplinary action up to and including termination of employment." *Id. at ¶135.*

The memos were to be issued to the plaintiff and to Shelley when they came to work for the third shift on the night of March 6, 2008. *Id. at ¶136.* Prior to the start of the third

shift, Long call the plaintiff and Shelley to inform them that they were to meet with Kauffman at the start of the third shift that night and that they would be receiving the counseling memo that she had prepared for each of them. *Id. at ¶137.*

The counseling memo was issued to the plaintiff on March 6th. *Id. at ¶138.* However, Shelley did not receive her memo that evening because she had called off from work prior to the start of her shift. *Id. at ¶139.*

Plaintiff's Reaction to Counseling Memo.

After the plaintiff received the counseling memo at the beginning of the shift on March 6th, she became loud and vulgar and began to throw objects at her work station. *Id. at ¶141.*[4] The plaintiff's behavior was so disruptive that many other employees in the work area had stopped work to watch her. *Id.*

4.  The plaintiff denies this statement from the defendant's statement of material facts.  The plaintiff cites to a page from her deposition and a page from the deposition of Kauffman in support of her denial.  However, the cited pages do not support her denial.  Accordingly, we deem this fact undisputed for purposes of the instant summary judgment motion.

30

*at ¶142.*[5]   Blewett requested that Kauffman remove the plaintiff from the floor. *Id. at ¶143.*

Kauffman took the plaintiff to his office where the plaintiff complained that the memo she had received was unfair because the rumors were going around about her. *Id. at ¶144.* Kauffman told the plaintiff that she should not let what other people say about her get to her. *Id. at ¶145.* According to Kauffman, the plaintiff then told him that she was going to "kick her [Shelley's] fucking ass." *Id. at ¶146.* The plaintiff denies making such a threat. *Doc. 31 at ¶146 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.*

Kauffman sent the plaintiff back to work and observed her closely the rest of the evening. *Doc. 27 at ¶149 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶149 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts*. When Camp arrived at the plant on the morning of March 7th, Kauffman told him that the plaintiff had made a

---

[5]   *See supra* note 4.

threat against Shelley. *Id. at ¶150.*[6]  Camp asked Kauffman to document his conversation with the plaintiff. *Id. at ¶151.*[7]

Camp immediately began an investigation into the alleged threat. *Id. at ¶156.*  According to Camp, he learned that three other employees had heard the plaintiff make threats of physical harm against Shelley that same night. *Id.*

Camp interviewed Ron Jury and Chad Kreamer concerning threats made by plaintiff against Shelley. *Id. at ¶157.* According to Camp, Jury told Camp that he had heard the plaintiff say: "If Larry doesn't take care of it, I will - even if I have to beat her [Shelley] up." *Id. at ¶158.*  However, Camp was not sure that he believed Jury's statement. *Doc. 32-24 at 40-41 (Camp Dep. at 39-40).*

---

[6]. The plaintiff denies this statement from the defendant's statement of material facts.  The plaintiff cites to a page from her deposition in support of her denial.  The cited page supports that plaintiff's contention that she did not make a threat against Shelley.  However, the cited page does not support the plaintiff's denial that Kauffman told Camp that the plaintiff had made a threat against Shelley.  Accordingly, we deem this fact undisputed for purposes of the instant summary judgment motion.

[7]. *See* supra Note 6.

According to Camp, Kreamer told Camp that he had heard the plaintiff say: "I would like to take a hold of Christine." *Doc. 27 at ¶159 of Defendant's Proposed Findings of Fact.*

Also according to Camp, Blewett told Camp that she had heard the plaintiff say: "I will take care of her no matter what I have to do, even if it is outside of work." *Id. at ¶161.* However, Blewett testified that she never witnessed the plaintiff threaten physical harm against Shelley, that the plaintiff never told her that she wanted to physically harm or hurt Shelley and that she does not recall overhearing the plaintiff make any threats of physical violence to Shelley. *Blewett Dep. at 112-113.*

The plaintiff denies making any of the alleged threats against Shelley. *Doc. 31 at ¶¶158-161 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.*

<u>The Plaintiff's Suspension</u>.

Camp suspended the plaintiff. *Doc. 27 at ¶152 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶152 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Kauffman walked the plaintiff to the door. *Id. at ¶153.* According to Kauffman, he told the plaintiff that she was suspended for threats to an employee pending an investigation and that higher management or Human Resources would be in contact with her. *Id.* According to the plaintiff, however, Kauffman told her that she was suspended because she allegedly made a comment about him. *Doc. 31 at ¶153 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Kauffman had no further involvement in the plaintiff's employment status with the defendant. *Doc. 27 at ¶155 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶155 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.*[8]

---

8.  The plaintiff contends that Kauffman was also involved in the decision to terminate her employment.  However, she has not pointed to record evidence supporting that contention. She points to deposition testimony of Blewett. *See Doc. 39-2 at 14 (page 125*
(continued...)

34

The plaintiff did not work at the defendant company and was not paid during her suspension. *Doc. 31 at ¶122 of Plaintiff's Counter Statement of Undisputed Facts.*

### The Plaintiff's Fax and Subsequent Meeting.

On March 11, 2008, the plaintiff faxed a letter to Long. *Doc. 27 at ¶162 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶162 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* The letter reads:

> I was suspended on March 7, 2008. Prior to me being suspended, I complained about statements that were sexually offensive. They make me very upset and I complained that I was in a hostile work environment. After I complained I was suspended. Are you investigating my complaint? Can someone please call me and tell me when I can return to work?

*Doc. 27-7 at 27.* Long immediately called the plaintiff to discuss the fax. *Doc. 27 at ¶164 of Defendant's Proposed*

---

8.    (...continued)
*of Blewett Dep.).* However, a review of the testimony of Blewett leads to the conclusion that Blewett did not have personal knowledge regarding that issue.

*Findings of Fact and Doc. 31 at ¶164 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Long scheduled a meeting for the two of them for the next day - March 12th. *Id. at ¶165.*

The meeting was held on March 12th with the plaintiff, Long and Joe Zanghi, the defendant's corporate HR manager. *Id. at ¶168 & 169.* The purpose of the meeting was to gather information from the plaintiff regarding the statements she made in her March 11th fax. *Id. at ¶171.*

Zanghi and Long confirmed with the plaintiff that they had received her fax and they asked her to explain the allegations in the fax. *Id. at ¶172.* The plaintiff told Zanghi and Long about the rumors and how they affected her. *Id. at ¶¶173-178.* She stated her belief that supervisors and managers did not want to deal with the problem. *Id. at ¶179.* The plaintiff told them to talk to Knepp and Harkleroad. *Id. at ¶180.*

36

The plaintiff explained that Kauffman had told her that Camp had told him to suspend her. *Id. at ¶189.* She claimed that she was not told a reason for her suspension. *Id.* Long explained to the plaintiff that she had been suspended because of threatening statements she had made against Shelley. *Id. at ¶190.*[9] The plaintiff told Long and Zanghi that she wanted her job back, that she wanted the rumors and the harassment to stop and that she wanted people to be aware of sexual harassment. *Id. at ¶192.*

When asked if she had any witnesses who could support what she had told Long and Zanghi, the plaintiff told them to talk to Ron Jury and Jeff Maneval. *Id. at ¶200.*

That night, Long called Jury and Maneval while they were at work on the third shift and spoke with them

---

[9]. The plaintiff denies this statement from the defendant's statement of material facts. She cites to pages from her deposition and the deposition of Camp to support her denial. However, the cited pages do not support a denial that Long told her that she was suspended during this meeting because of threatening statements against Shelley. Accordingly, we deem this fact undisputed for purposes of the instant summary judgment motion.

individually. *Id. at ¶201.*   Neither Jury nor Maneval

corroborated the plaintiff's allegations against Shelley. *Id.*

*at ¶202.*   Harkleroad never independently heard the rumors other

than what the plaintiff told her. *Id. at ¶203.*


          The Plaintiff's Termination.


          On April 9, 2008, Richard O'Neill called the plaintiff

and informed her that her employment was terminated. *Doc. 31 at*

*¶138 Plaintiff's Counter Statement of Undisputed Facts.*   Long,

Camp and O'Neill were the decision makers involved in the

decision.[10] *Doc. 27 at ¶205 of Defendant's Proposed Findings of*

*Fact and Doc. 31 at ¶205 of Plaintiff's Response to Defendant's*

*Statement of Undisputed Material Facts.*   The plaintiff was told

that she was terminated for making threats against Shelley in

violation of the defendant's workplace violence policy. *Id. at*

*¶207.*

---

10.  *See supra* Note 8.

38

The defendant waited for approximately a month after suspending the plaintiff's employment before terminating the plaintiff's employment.  The defendant delayed the termination so as to conduct a further investigation of the allegations in the plaintiff's March 11th fax and because Long and the plaintiff  had agreed that while the plaintiff was on vacation in Disney World during the period the defendant would not contact her about its decision. *Id. at ¶208.*

At the time her employment was terminated, the plaintiff had no work restrictions or limitations due to any alleged impairment. *Id. at ¶263.*

IV. Discussion.

A. Title VII Claims.

The plaintiff presents two Title VII claims - a hostile work environment claim and a retaliation claim.  We will address each in turn.

39

1. Hostile Work Environment Claim.

Under Title VII it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This provision not only covers "terms" and "conditions" in the narrow sense, "but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'" *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78 (1998)(quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986)). Thus, sexual harassment so severe or pervasive as to alter the conditions of employment and create a hostile working environment violates this provision. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

In order to prevail on her hostile work environment claim, the plaintiff must establish (1) that she suffered

intentional discrimination because of her sex, (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her; (4) that the discrimination would have detrimentally affected a reasonable person of the same sex in like circumstances; and (5) a basis for employer liability. *Huston v. Proctor & Gamble Paper Products Corp.,* 568 F.3d 100, 104 (3d Cir. 2009); *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on other grounds by Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006).

The plaintiff claims that she was subject to a hostile work environment because of the rumors about her. Before we address whether the plaintiff has presented evidence supporting the elements of a hostile environment claim, we address the defendant's argument that the rumors are inadmissible hearsay.

Hearsay.

The defendant argues that the rumors upon which the plaintiff relies to support her hostile work environment claim

41

are inadmissible hearsay which can not be considered in connection with a summary judgment motion.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

The plaintiff is not offering the rumors to prove the truth of the matters asserted by the rumors. In fact, the plaintiff asserts that the rumors asserted facts that were not true. The plaintiff is offering the rumors to attempt to prove that they were made and repeated and that they created a hostile work environment. It is not in dispute, and is plainly established by the summary judgment evidence, that a number of witnesses can testify that they heard some other identified speaker speak one or more of the rumors. Since the plaintiff is not offering the rumors to prove the truth of the matters asserted by the rumors, and since there are witnesses who can testify that they heard the rumors spoken, there is not a

42

summary judgment hearsay basis for not considering evidence of the rumors.

We turn to an analysis of the elements of a hostile work environment claim. We conclude that the defendant should be granted summary judgment on the plaintiff's hostile work environment claim because the plaintiff has failed to present evidence to reasonably support an inference that she was subject to intentional discrimination because of her sex or that the discrimination was severe or pervasive. Thus, the plaintiff has failed to present evidence supporting two of the five elements of a hostile work environment claim. We address the elements seriatim.

Intentional Discrimination because of Sex.

The defendant contends that the plaintiff can not establish that she suffered intentional discrimination because of her sex.

43

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998)(quoting 42 U.S.C. § 2000e-2(a)(1)). "When harassment is facially sexual, i.e., when it 'involves sexual propositions, innuendo, pornographic materials, or sexually derogatory language,' an inference of sex-based intent will usually arise." *Jenson, supra,* 435 F.3d at 454 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990)). "But discrimination comes in many forms, and it need not be overtly sexual to be actionable." *Id.* at 454. Nevertheless, work placement harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale, supra,* 523 U.S. at 80. "'The critical issue, Title VII's text indicates, is whether members or one sex are exposed to disadvantageous terms or conditions of employment to which members or the other sex are not exposed.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25 (1993)(Ginsburg, J., concurring)).

44

Rumors can amount to discrimination because of sex.  In *Spain v. Gallegos,* 26 F.3d 439 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit addressed a case involving rumors.  In *Spain*, the Third Circuit reversed the district court's grant of summary judgment to the defendant on Spain's claims of sexual discrimination and harassment. *Id.* at 456.

In *Spain,* the Third Circuit considered the following evidence.  Spain was passed over for promotions and filed an EEOC complaint. *Id.* at 442.  Nelson, the plaintiff's superior, induced her not to proceed with the EEOC complaint by promising her a promotion as long as she agreed to lend him money periodically. *Id.*  The plaintiff agreed and was promoted. *Id.* Because of Nelson's frequent demands for loans, other employees would often see the plaintiff and Nelson together privately in his office, in the cafeteria and leaving the office. *Id.*  As a result of these frequent private meetings, over the years rumors developed that the plaintiff and Nelson were having an affair. *Id.*  The rumors asserted that Spain had attained influence with Nelson through the use of a sexual relationship.

45

*Id.* at 451.   The plaintiff complained to Nelson and requested

that he put an end to the rumors. *Id.* at 442.   However, Nelson

continued to request loans of the plaintiff in private meetings

thereby perpetuating the rumors. *Id.*   The rumors embarrassed

the plaintiff and caused her coworkers to ostracize her. *Id.*

The plaintiff refused to lend Nelson any more money, and as a

result he escalated his harassment of her and ultimately used

the rumors to deny her a promotion. *Id.* at 442-43.


The Third Circuit indicated that Spain charged that her

work environment was affected in the following five ways:

> First, she was subjected to the spreading of
> false rumors about her sexual affairs that
> impugned the integrity of her job performance.
> The very existence of the rumors caused Spain
> embarrassment.  Second, due to the rumored
> sexual relationship, Spain's co-workers
> allegedly treated her like an outcast, leading
> to poor interpersonal relationships between
> herself and them, causing Spain to feel
> miserable.  Third, the rumors and the resulting
> poor interpersonal relationships at work led
> supervisory personnel to evaluate Spain
> negatively for advancement purposes. . . .
> Fourth, Spain alleges that Nelson knowingly
> exacerbated the situation.  After creating the
> conditions in which the rumors developed,
> Nelson perpetuated the rumors by continuing to

46

demand loans from Spain and to meet with her
privately for this purpose, even after Spain
informed him of the rumors and asked him to
stop them.  Finally, Spain contends that Nelson
denied her a promotion in 1990 based on the
rumors and the resulting effects they had upon
her interpersonal relationships at work and her
evaluations by her supervisors.

*Id.* at 447-48.

The Third Circuit concluded that the plaintiff had
presented sufficient evidence of intentional discrimination
because of her sex to withstand summary judgment. *Id.* at 448.
The court determined that the crux of the rumors and their
impact upon Spain was that Spain "a female, subordinate
employee, had a sexual relationship with her male superior."
*Id.*  The court observed that "[u]nfortunately, traditional
negative stereotypes regarding the relationship between the
advancement of women in the workplace and their sexual behavior
stubbornly persist in our society." *Id.*  The court determined
that "[a] jury reasonably could conclude that if Spain had been
a male, rumors would not have started that she had gained
influence with Nelson through physically using her sex." *Id.*

47

The court also indicated that while the rumors implicated Nelson they "did not suggest that his involvement in the alleged relationship had brought him additional power in the workplace over his fellow employees, and the employees had no reasons for resenting him in the way they did Spain." *Id.*

The Third Circuit in *Spain* distinguished the circumstances in that case from other cases that might not support a sexually hostile work environment claim:

> [T]his is not a case in which rumors concerned the behavior of a co-worker outside of the workplace, or in which rumors developed as the result of other employees' misperception of a supervisor's and an employee's frequent but necessary, job-related interaction.  Rather, here there are factual questions for trial of whether the rumors developed and persisted as a result of Nelson's improper behavior.  As in *Jew [v. University of Iowa]*, the situation here was "not merely one of idle gossip about an alleged office romance." 749 F.Supp. at 959. Consequently, Spain properly has alleged, and supported with materials developed in discovery, that the rumors directed at her and her resulting ostracization and adverse evaluation for advancement purposes were both sex-based and intentional.

*Id.* at 448-49.

Unlike the rumors in *Spain,* the rumors in this case were not that the plaintiff was having an affair or affairs with a supervisor and using her sex to gain advancement. Rather, in this case, the rumors were that the plaintiff was having affairs with non-supervisory co-workers. Thus, the circumstances in this case are more like the idle gossip situation distinguished by the Third Circuit in *Spain* than they are like the circumstances that the Third Circuit concluded could amount to intentional discrimination because of sex.

Whoever started the rumors may not have liked the plaintiff. But, just because a coworker may not have liked the plaintiff does not mean that the coworker was discriminating against the plaintiff based on sex. *Derringe v. Old National Bank*, No. 3:04-CV-217-RLY-WGH, 2006 WL 3076679 at *6 (S.D. Ind. 2006)("Evidence of office gossip amongst one's co-workers, in and of itself, is insufficient to establish a hostile work environment claim against one's employer.").

The rumors in this case involved both male and female co-workers. Since both males and females were the subject of

49

the rumors and since the rumors did not involve assertions that the plaintiff was using her sex to gain advantage, the plaintiff has not presented evidence to reasonably support an inference that she suffered intentional discrimination because of sex.

Given that the plaintiff has not presented evidence to reasonably support an inference that she suffered intentional discrimination because of sex, the defendant is entitled to summary judgment on the plaintiff's hostile work environment claim.  We will nevertheless address the other elements of the hostile work environment claim in the event that the district judge disagrees with our analysis above.

<u>Severe or Pervasive Discrimination</u>.

Even assuming that the plaintiff presented sufficient evidence that she suffered discrimination because of sex, she has not presented evidence to reasonably support an inference that the discrimination was severe or pervasive.

For harassment to be actionable it must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Meritor Savings Bank*, *supra,* 477 U.S. at 67 (1986). The United States Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, *supra,* 524 U.S. at 788. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)(quoting *Meritor Savings Bank, supra,* 477 U.S. at 65 & 67). Whether an environment is hostile or abusive can be determined only by looking at all of the circumstances. *Id.* at 23. The circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount

51

to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, *supra,* 524 U.S. at 788 (quoting *Oncale, supra,* 523 U.S. at 82).

In the instant case, the harassment at issue consists of the rumors about the plaintiff.  The rumors were not physically threatening.  Rather, they were merely offensive utterances.  Although no doubt hurtful to the plaintiff, the rumors are not the kind of severe harassment sufficient to support a hostile work environment claim.  We conclude that the plaintiff has not presented evidence to reasonably support an inference that the rumors were severe.

"Harassment is pervasive where incidents of harassment occur with regularity." *Endres v. Techneglas, Inc.,* 139 F.Supp.2d 624, 631 (M.D.Pa. 2001).  In the instant case, the plaintiff points to a handful of rumors about her.  However, she has not pointed to evidence regarding how frequently she heard these rumors.[11]  Accordingly, we conclude that the

_____

11. The evidence that the plaintiff does point to with regard to
(continued...)

plaintiff has not presented evidence to reasonably support an inference that the rumors were pervasive.

Given that the plaintiff has not presented evidence to reasonably support an inference that the rumors were severe or pervasive, the defendant is entitled to summary judgment on the plaintiff's hostile work environment claim.  We will nevertheless address the remaining elements of a hostile work environment claim.

Subjective Effect.

The third element of a hostile work environment claim is that the discrimination detrimentally affected the plaintiff.  The defendant argues that the plaintiff has failed to demonstrate sufficiently subjective detrimental effects to

─────────────

11.  (...continued)
whether the rumors were severe or pervasive is pages from her deposition where she testified generally about rumors and sexual innuendo, the rumor about her and Knepp and a padded headboard, the rumors about her and Knepp having sex on the way to work and the way to the ER and the rumor about her being a lesbian. *See Doc. 31-2 at 20 and pages of deposition cited therein.*  She has not however pointed to evidence of how often she heard these rumors.

constitute a hostile work environment claim.  However, the
plaintiff has presented evidence that she was upset about the
rumors and that the rumors affected her. *Doc. 32-4 at 27 (page
125 of Treaster Dep.).*  Accordingly, the plaintiff has
presented evidence to reasonably support an inference that the
rumors detrimentally affected her.

        Objective Effect.

        The fourth element of a hostile environment claim is
that the discrimination would have detrimentally affected a
reasonable person of the same sex in like circumstances.

        The Third Circuit has recognized that this element and
the severe or pervasive element overlap. *Jenson, supra,* 435
F.3d at 451.  As discussed above, the plaintiff has not
presented evidence to reasonably support an inference that the
rumors were severe or pervasive.  Nevertheless, the plaintiff
has presented evidence from which is can reasonably be inferred

54

that the rumors would have detrimentally affected a reasonable

woman.

The plaintiff contends that other employees would

ignore her in the break room.[12]  The plaintiff testified:

> . . . [I]t got to the point where I couldn't
> walk in the building without everybody staring
> at me.  Nobody would sit with me. I'd sit down
> at a table, everyone would get up and leave.

*Doc. 32-3 at 93 (page 92 of Treaster Dep.).*  She testified that

she cried the whole way to work knowing what she had to go in

and deal with and that she cried the whole way home because she

felt rotten. *Doc. 32-4 at 27 (page 125 of Treaster Dep.).*  She

testified that "[e]verybody made me feel rotten." *Id.*

Title VII is not intended to cure a cold shoulder or

ostracism by co-workers. *Grady v. Cracker Barrel Old Country*

*Store,* No. 4:CV-06-558, 2007 WL 1959298 at *11 (M.D.Pa. July 2,

--------

12.  The plaintiff also contends that other of her co-workers
would no longer drive with her to and from work and that one co-
worker informed her that he could no longer speak to her because
his wife had learned of the rumors. *See Doc. 47 at 13.*  However,
the pages of her deposition that the plaintiff cited do not
support those assertions.

2007)(Jones, J.); *Jenson, supra,* 435 F.3d at 452 ("A cold shoulder can be hurtful, but it is not harassment."). Even so, we can not say as a matter of law that the rumors would not have detrimentally affected a reasonable woman in like circumstances.

        Employer Liability.

        The final element of an hostile work environment claim is employer liability.

        When the hostile work environment is created by non-supervisory coworkers, the employers is not automatically liable. *Huston v. Proctor & Gamble Paper Products Corp.,* 568 F.3d 100, 104 (3d Cir. 2009). "Rather, employer liability for co-worker harassment exists only if the employer fails to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* "That is, an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer

56

was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment." *Id.* at 104-105. "An employer's remedial action is adequate 'if it is reasonably calculated to prevent further harassment.'" *Id.* at 110. "A remedial action that stops the harassment is adequate as a matter of law." *Andreoli v. Gates,* 482 F.3d 641, 644 n.2 (3d Cir. 2007). "Even if the remedial action does not stop the alleged harassment, it is 'adequate' if it is 'reasonably calculated' to end the harassment." *Id.* at 644 (quoting *Jenson v. Potter,* 435 F.3d 444, 453 (3d Cir. 2006)).

Here, it is undisputed for purposes of the summary judgment motion that Kauffman had three separate meetings with all of the third shift employees at which they were all warned to stop the rumor-mongering. It is also undisputed that there were two meetings where the plaintiff and Shelley were brought in and told that the behaviors of which they were accusing each other had to stop. It is further undisputed that Camp met yet another time with Shelley and directed her not to participate or involve herself with the plaintiff and not to spread false or malicious rumors. Contrary to the plaintiff's suggestion,

we conclude that a reasonable fact finder could not conclude that such remedial actions were inadequate.

Apart from the sufficiency of any remedial actions taken, the plaintiff contends that there is employer liability because the defendant was negligent in not taking any action at all for more than a month after she first complained about the rumors. There is a genuine dispute of fact about when the plaintiff first reported the rumors. According to the defendant, the plaintiff reported the rumors to Blewett and Kauffman in late February or early March of 2008. *Doc. 27 at ¶28 of Defendant's Proposed Findings of Fact.* According to the plaintiff, she first reported the rumors to Blewett in late January or early February of 2008. *Doc. 31 at ¶28 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Since the plaintiff is the non-moving party, we must accept the plaintiff's version and thus we assume that the plaintiff first reported the rumors to Blewett in late January or early February of 2008.

It is not clear from the record when Kauffman first met with the third shift employees and warned them all to stop the rumor-mongering.  However, since the defendant contends that it was not informed of the rumors until late February or early March, we assume that the first meeting with the shift did not occur until late February or early March 2008.  Accordingly, accepting the plaintiff's contention that she first complained to Blewett in late January or early February of 2008, there is an approximate one month gap between when the rumors were first reported and when any action was taken to address the rumors.

The defendant asserts, nevertheless, that the plaintiff has not presented evidence from which a reasonable finder of fact could conclude that Blewett was a management level employee such that her knowledge of the plaintiff's complaint can be imputed to the defendant.  "Mere supervisory authority over the performance of work assignments by other co-workers is not, by itself, sufficient to qualify an employee for management level status." *Huston, supra,* 568 F.3d at 108.  Rather, "an employee's knowledge of allegations of coworker sexual harassment may typically be imputed to the employer in

two circumstances: first, where the employee is sufficiently

senior in the employer's governing hierarchy, or otherwise in a

position of administrative responsibility over employees under

him, such as a departmental or plant manager, so that such

knowledge is important to the employee's general managerial

duties . . . [s]econd, an employee's knowledge of sexual

harassment will be imputed to the employer where the employee

is specifically employed to deal with sexual harassment." *Id.*

at 107.  The plaintiff has not presented evidence to reasonably

support an inference that Blewett was either a sufficiently

senior management employee or employed specifically to deal

with sexual harassment such that her knowledge of the

plaintiff's complaint can be imputed to the defendant.


    Although the plaintiff has not presented evidence that

her complaint to Blewett in and of itself imputed knowledge of

her complaint to the defendant, the defendant asserts that

Blewett reported the plaintiff's complaint to Kauffman.[13]  It is

---

13.  The defendant does not argue that Kauffman was not a
management level employee such that his knowledge of the
plaintiff's complaint can not be imputed to the defendant.

the defendant's position that such a complaint was not made to Blewett until late February of early March 2008.  However, Blewett's testimony was that she reported the plaintiff's complaint to Kauffman the same night that the plaintiff made the complaint but that she could not recall when the plaintiff made the complaint.  *Doc. 27-3 at 6 & 8 (pages 56 & 62 of Blewett Dep.).*  Accepting the plaintiff's contention that she first complained to Blewett in late January or early February of 2008 and accepting Blewett's testimony that she reported the plaintiff's complaint to Kauffman the same night that it was made, there is evidence from which a reasonable inference can be drawn that Kauffman was aware of the plaintiff's complaint in late January or early February of 2008.  As indicated above, there is an approximate one month gap between when the rumors were first reported and when any action was taken to address the rumors.  It is for a fact finder to determine whether such a delay was reasonable.  Thus, the defendant is not entitled to summary judgment on the plaintiff's hostile work environment claim on the basis of the employer liability element of such a claim.

As already stated, above, the defendant should be granted summary judgment as to the plaintiff's hostile work environment claim because the plaintiff has not presented evidence to reasonably support an inference that she suffered intentional discrimination because of sex or that the rumors were severe or pervasive.

2. Retaliation Claim.

The retaliation provision of Title VII provides that it is an unlawful employment practice for an employer to discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice" by the statute or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show that[:] (1) she engaged in protected activity under Title VII; (2) the employer took an

adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 320 (3d Cir. 2008). If the employee establishes a *prima facie* case, "the familiar *McDonnell Douglas* approach applies in which 'the burden shifts to the employer to advance a legitimate non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore v. City of Philadelphia,* 461 F.3d 331, 342 (3d Cir. 2006)(quoting *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir. 1997)).

The defendant contends that the plaintiff can not establish a *prima facie* case because she did not engage in protected activity and because she can not show a causal connection between her complaint about the rumors and her suspension and discharge.

63

<u>Protected Activity</u>.

The defendant argues that the plaintiff can not establish that she engaged in protected activity. The defendant argues that no reasonable person could believe that the rumors that the plaintiff complained about constituted unlawful discrimination.

"'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.'" *Moore v. City of Philadelphia,* 461 F.3d 331, 343 (3d Cir. 2006)(quoting *Curay-Cramer v. Ursuline Acad. of Wilmington,* 450 F.3d 130, 135 (3d Cir. 2006)). The employee "must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id.* at 341. "To put it differently, if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." *Wilkerson, supra,* 522 F.3d at 322. However, the employee need not prove the merits

64

of the underlying claim in order to seek redress under the retaliation provision. *Moore, supra,* 461 F.3d at 344.

The plaintiff's testimony supports that she subjectively believed that she was complaining about sexual discrimination. The more difficult question is whether that belief was reasonable. As discussed above, we have determined that the plaintiff has not presented evidence to reasonably support an inference that she suffered intentional discrimination because of sex. That determination is based upon the fact that the rumors involved affairs with co-workers and did not involve, for example, negative stereotypes as to women in the workplace. Nevertheless, rumors can amount to discrimination because of sex. *See Spain, supra,* 26 F.3d 439. We can not say as a matter of law or as a matter beyond factual dispute that the plaintiff's belief that she was complaining about sexual discrimination was not reasonable. Accordingly, the defendant is not entitled to summary judgment as to the plaintiff's Title VII retaliation claim on the basis that the plaintiff did not engage in protected activity.

65

The defendant does not argue that the plaintiff can not satisfy the second element of a *prima facie* retaliation claim. The plaintiff's suspension and termination were adverse actions. The defendant does contend that the plaintiff can not establish the third element - a causal connection - of a *prima facie* retaliation claim. Thus, we turn to that element.

Causal Connection.

The defendant contends that the plaintiff can not show a causal connection between her complaints about the rumors and her suspension and discharge.

A plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between her protected activity and the adverse action taken against her. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Philadelphia Housing Auth.,* 497 F.3d 286,

302 (3d Cir. 2007) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997)).  "Conversely, however, '[t]he mere passage of time is not legally conclusive proof against retaliation.'" *Id.* (quoting *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)).  "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon v. Lancaster Jewish Community Center Assoc.*, 503 F.3d 217, 232 (3d Cir. 2007)(quoting *Farrell*, *supra,* 206 F.3d at 280).  For example, actual antagonistic conduct or animus against the employee during the intervening period may demonstrate causation. *Marra, supra,* 497 F.3d at 302.  Also, other types of circumstantial evidence, such as inconsistent reasons given by the employer for the action, or the employer's treatment of other employees, may give rise to an inference of causation. *Id.*  Evidence that the reason given for the adverse action was pretext may also be relevant to the issue of causation. *Weston v. Pennsylvania,* 251 F.3d 420, 432 (3d Cir. 2001).

The plaintiff relies on the timing of her suspension and discharge in relation to her complaints about the rumors to support an inference of causation. As discussed above, according to the plaintiff, she first reported the rumors in late January or early February of 2008. *Doc. 31 at ¶28 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* But, there is also evidence that she reported the rumors in late February or early March of 2008. *Doc. 27 at ¶28 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶28 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts*. Further, there is evidence that the plaintiff complained about the rumors during the March 3rd meeting and during her March 5th telephone conversation with Long. *Id. at ¶¶46 & 67.* The plaintiff was suspended on March 7th. *Doc. 27 at ¶150 & 152 of Defendant's Proposed Findings of Fact.* The close temporal proximity between the plaintiff's early March of 2008 complaints and her March 7, 2008 suspension is some evidence of a causal connection between the two events. Given that the plaintiff's termination followed from the events leading to her suspension, we conclude that the temporal proximity between the plaintiff's complaints and her suspension is also some

68

evidence of a causal connection between the plaintiff's complaints and her termination.

The plaintiff, however, does not rely on temporal proximity alone to support an inference of causation. The plaintiff also contends that the fact that the defendant has asserted inconsistent reasons for her suspension supports an inference of causation.

According to the plaintiff, Kauffman told her that she was suspended because she allegedly made a comment about him. *Doc. 31 at ¶153 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* Kauffman denies that he told the plaintiff that she was suspended because she allegedly made a comment about him and he asserts that he told her that she was under suspension for threats to an employee pending an investigation. *Doc. 32-32 at 41 & 45 (pages 40 & 44 of Kauffman Dep.).*

The defendant argues that Kauffman's purported statement that the reason the plaintiff was suspended is

69

because she allegedly made a comment about him is inadmissible
hearsay.  However, the statement is not hearsay because it is
not offered for the truth of the matter asserted.  The
plaintiff does not contend that she was terminated because she
made a comment about Kauffman.  Rather, she is introducing
Kauffman's statement to show that she was told a reason for her
suspension that was a reason different from the one that the
defendant later asserted as the reason for her suspension and
termination.  As to the factual issue whether Kauffman made
that statement, the plaintiff's assertion is not hearsay.
Thus, the plaintiff's assertion that Kauffman told her that she
was suspended because she allegedly made a comment about him is
not hearsay.[14]

An employee may establish a causal connection by
showing that the employer gave inconsistent reasons for the
adverse action. *Farrell*, *supra,* 206 F.3d at 281.  The
plaintiff's evidence that she was given a reason different from

_____

14.  Although we need not decide the issue, even if the statement
was offered to prove the truth of the matter asserted it may not
be hearsay because it is an admission of a party-opponent. *See*
Fed.R.Evid. 801(d)(2).

the reason later proffered by the defendant is evidence that could reasonably support an inference of causation.  If inconsistent reasons are given, the fact finder might infer that it is therefore more likely that neither reason, but rather some other reason that the party does not want to disclose, is the actual reason.

Moreover, as discussed below, the plaintiff has presented evidence from which a reasonable fact finder could conclude that the reason given by the defendant for her suspension and termination (i.e. that she threatened Shelley) was pretext.  This evidence is also evidence from which a reasonable trier of fact could conclude that there was a causal connection between the plaintiff's complaints about the rumors and her suspension and termination. *See Weston, supra,* 251 F.3d at 432 (stating that pretext evidence can be relevant to the causation element of a *prima facie* case).

In sum, we conclude that based on the evidence presented by the plaintiff regarding the timing or her suspension and termination in relationship to her complaints

71

about the rumors, regarding the alleged inconsistent reasons given by the defendant for her suspension and regarding her evidence of pretext, the plaintiff has presented evidence from which a reasonable fact finder could find a causal connection between he complaints and her suspension and termination.[15]

Given our conclusion that the plaintiff has presented evidence to support a *prima facie* case, we turn to the remaining steps of the *McDonnell Douglas* analysis.

Legitimate Nondiscriminatory Reason.

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). An employer satisfies its burden of production by introducing evidence which would permit the conclusion that

---

15. Given this conclusion, we need not analyze the plaintiff's contention that the defendant engaged in a pattern of antagonism against her between the time of her complaints and her suspension and termination.

there was a nondiscriminatory reason for the unfavorable employment decision. *Id*.  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

In this case, the defendant has articulated a legitimate nondiscriminatory reason for suspending and then terminating the plaintiff's employment, that the plaintiff was found by the defendant to have threatened Shelley.

<u>Pretext</u>.

Once the defendant meets its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff.  To defeat summary judgment the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

73

was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, *supra,* 32 F.3d at 764.  To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (citations omitted).  "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995).  Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, *supra*, 32 F.3d at 765.

As discussed above, the plaintiff has presented evidence that she was given a reason for her suspension different from the reason later proffered by the defendant. This is evidence that could reasonably support an inference that the defendant's purported reason was pretext for retaliation.

Further, although the defendant presented evidence that it suspended and then terminated the plaintiff's employment because the plaintiff made threats regarding Shelley, the plaintiff denies making any such threats.

The plaintiff has pointed to evidence from which a reasonable trier of fact could conclude that the defendant did not rely on the threats purportedly heard by Jury and Blewett. Camp testified that he was not sure that he believed Jury's statement. *Doc. 32-24 at 40-41 (Camp Dep. at 39-40)*. Blewett testified that she never witnessed the plaintiff threaten physical harm against Shelley, that the plaintiff never told her that she wanted to physically harm or hurt Shelley and that

75

she does not recall overhearing the plaintiff make any threats of physical violence to Shelley. *Blewett Dep. at 112-113.*

According to Camp, Kreamer told Camp that he had heard the plaintiff say: "I would like to take a hold of Christine." *Doc. 27 at ¶159 of Defendant's Proposed Findings of Fact.*  The defendant, however, has not pointed to deposition testimony or an affidavit from Kreamer asserting that he made such a statement.

That leaves the threat that the plaintiff purportedly made in the presence of Kauffman.  This is the purported threat that started the ball rolling.  As the defendant argues, the issue is not whether or not the defendant was correct that the plaintiff actually made such a threat but whether the defendant believed that the plaintiff had made such a threat.

Kauffman was a supervisory employee of the defendant. Although Camp made the decision to suspend the plaintiff, there is evidence that Kauffman was involved in the plaintiff's suspension.  First, he was the one that reported the threat to

76

Camp. *Doc. 27 at ¶150 of Defendant's Proposed Findings of Fact.*

Second, he walked the plaintiff out of the plant and allegedly

told her the reason for her suspension. *Id. at ¶153.* Third, he

testified that he suspended the plaintiff. *Doc. 32-32 at 33*

*(page 32 of Kauffman Dep.).* Given that the plaintiff denies

making such a threat, viewing the evidence in the light most

favorable to the plaintiff we conclude that the plaintiff has

presented evidence from which a reasonable fact finder could

rationally find the defendant's asserted reason for suspending

and then terminating her employment to be pretext for

retaliation.

Based on the above, we conclude that the defendant is

not entitled to summary judgment on the plaintiff's Title VII

retaliation claim.

B.   FMLA Claims.

"Congress enacted the FMLA in 1993 to accommodate 'the

important societal interest in assisting families, by

establishing a minimum labor standard for leave.'" *Sommer v.*

*The Vanguard Group,* 461 F.3d 397, 398-99 (3d Cir. 2006)(quoting *Churchill v. Star Enters.,* 183 F.3d 184, 192 (3d Cir. 1999)). "The primary purposes of the FMLA are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.'" *Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005)(quoting 29 U.S.C. § 2601(b)(1) and (2)). "The FMLA endeavors to accomplish these purposes 'in a manner that accommodates the legitimate interests of employers.'" *Id.* (quoting 29 U.S.C. § 2601(b)(3)).

The FMLA "creates a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct." *Id.* Eligible employees are entitled to a total of twelve weeks of leave during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform the functions of his or her position. *Id.* Following a qualified absence, the employee is entitled to be reinstated to his or her former position or an

alternative one with equivalent pay, benefits and working

conditions. *Id.*

The FMLA provides that "[i]t shall be unlawful for any

employer to interfere with, restrain, or deny the exercise of

or the attempt to exercise, any right provided" under the FMLA.

29 U.S.C.S. § 2615(a).  Claims brought under Section 2615(a)

are known as interference claims. *Sommer, supra,* 461 F.3d at

399.  Additionally, the FMLA provides that "[i]t shall be

unlawful for any employer to discharge or in any other manner

discriminate against any individual for opposing any practice

made unlawful by" the FMLA. 29 U.S.C.S. § 2615(b).  Claims

brought under Section 2615(b) are often referred to as

discrimination or retaliation claims.[16] *Callison, supra,* 430

F.3d at 119*.*

---

16. 29 U.S.C.S. § 2615(b) also prohibits discrimination against
an individual because of filing charges or instituting proceedings
under the FMLA, giving information in connection with an inquiry
or proceeding under the FMLA and testifying in any inquiry or
proceeding relating to a right under the FMLA.  That provision is
not at issue in this case.

In the instant case, the plaintiff presents both interference and retaliation claims.  We address each in turn.

1. Interference Claims.

In her amended complaint, the plaintiff alleges that she requested FMLA leave for her depression and anxiety, that she was terminated after she received FMLA paperwork, that the defendant misinformed her of her FMLA rights and informed her that FMLA was only permitted if her medical leaves were habitual. *Doc. 17 at ¶¶21-23.*  The plaintiff claims that the defendant interfered with her FMLA rights "by misinforming her o[f] her rights to prevent her from applying for FMLA." *Id. at* ¶36.  The plaintiff also claims that the defendant interfered with her FMLA rights by terminating her when it became aware that she intended to exercise her rights under the FMLA. *Id. at* ¶37.

"To state a claim for interference under the FMLA, a plaintiff must show that: (1) he or she was an eligible

80

employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Johnson v. Community College of Allegheny County,* 566 F.Supp.2d 405, 446 (W.D.Pa. 2008). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison, supra,* 430 F.3d at 120. Because an interference claim is not about discrimination, "a *McDonnell-Douglas* burden-shifting analysis is not required." *Sommer, supra,* 461 F.3d at 399.

The defendant does not contend that the plaintiff can not establish the first two elements of an interference claim. It does, however, contend that the plaintiff can not establish the final three elements of an interference claim. Thus, we address each of those elements.

Serious Health Condition.

81

The third element of an FMLA interference claims is
that the plaintiff was entitled to FMLA leave.  To be entitled
to FMLA leave, the plaintiff must have suffered from a serious
health condition.  The defendant contends that the plaintiff
has not established that she was entitled to FMLA leave because
she has not established that she suffered from a serious health
condition.

The FMLA defines the term "serious health condition" to
mean "an illness, injury, impairment, or physical or mental
condition that involves - (A) inpatient care in a hospital,
hospice, or residential medical care facility; or (B)
continuing treatment by a health care provider." 29 U.S.C.
§ 2611(11).

The plaintiff has presented an affidavit from Dr.
Sharon Galvin. *Doc. 32-27.*  Dr. Galvin states in her affidavit
*inter alia* that in October of 2007 she diagnosed the plaintiff
with panic disorder, that panic disorder is a mental illness
that can involve stress, anxiety and/or panic attacks, that
since October of 2007 she continues to treat the plaintiff for

82

panic disorder and other medical issues, that she concluded
that the plaintiff's panic disorder affected the plaintiff's
daily functioning and that she excused the plaintiff from work
on February 21-22, 2008 due to her panic disorder. *Id.* at *¶¶10,
11, 12 & 18.*

Based on Dr. Galvin's affidavit, we conclude that the
plaintiff has presented evidence that can reasonably support an
inference that she suffered from a serious health condition.[17]

<u>Notice</u>.

---

17. In a footnote in its reply brief, the defendant objects to
the plaintiff's submission of Dr. Galvin's affidavit.  The
defendant contends that Dr. Galvin's affidavit is untimely given
that it was not executed until December 21, 2009 and the deadline
set for disclosure of expert reports was October 31, 2009 and the
discovery deadline was December 15, 2009.  The defendant requests
that the court strike Dr. Galvin's affidavit.  A footnote is not
the proper way to raise such an issue.  Nevertheless, the
defendant has failed to establish a reason to strike Dr. Galvin's
affidavit.  Given that Dr. Galvin is the plaintiff's treating
physician, the plaintiff was not required to provide a report from
Dr. Galvin pursuant to Fed.R.Civ.P. 26(a)(2)(B) or the court's
Order #1 of June 26, 2009.  Moreover, we know of no reason why a
party may not have a witness execute an affidavit after the close
of the discovery period.

The fourth element of an FMLA interference claim is that the plaintiff gave notice to the defendant of her intention to take FMLA leave.  The plaintiff bases her FMLA interference claims on two different events - her February 22, 2008 absence and her March 5, 2008 request for FMLA paperwork.

As to her February 22, 2008 absence, the plaintiff has presented evidence that she informed Kauffman that she had anxiety and depression and that the medications that she was taking to try to regulate those conditions could cause drowsiness. *Doc. 32-4 at 45 (page 143 of Treaster Dep.).*  The plaintiff has presented evidence from which a reasonable trier of fact could conclude that she satisfied the notice requirement of an FMLA interference claim as to the February 22, 2008 absence.

The plaintiff, however, has not presented evidence from which a reasonable trier of fact could conclude that she satisfied the notice requirement of an FMLA interference claim as to her March 5, 2008 request for FMLA paperwork.  On March 5, 2008, the plaintiff went to Human Resources Assistant

84

Cynthia Fultz and obtained FMLA paperwork. *Doc. 27 at ¶245 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶245 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* The plaintiff testified that she told Fultz that she was told by Kauffman to get FMLA papers in case she would need to be off with a medical excuse. *Doc. 32-4 at 45, 46 & 52 (pages 143, 144 & 150 of Treaster Dep.).* But, the plaintiff testified, when she got the FMLA paperwork from Fultz she was not planning on taking time off and her doctor had not suggested that she take time off at that point. *Doc. 32-4 at 45 (page 143 of Treaster Dep.).* She testified that she was requesting the FMLA paperwork only in preparation in case she were to need FMLA in the future. *Doc. 32-4 at 44 (page 142 of Treaster Dep.).* Given the plaintiff's testimony that on March 5th she was not requesting FMLA leave but was only getting the paperwork for the future, we conclude that the plaintiff has not presented evidence from which a reasonable trier of fact could conclude that she satisfied the notice requirement of an FMLA interference claim as to her March 5, 2008 request for FMLA paperwork. Accordingly, we will recommend that the defendant be granted summary judgment on the plaintiff's FMLA

interference claims to the extent that they are based on her

March 5th request for FMLA paperwork.[18]


Denied Benefits.


The fifth element of an FMLA interference claim is that

the plaintiff was denied benefits to which she was entitled

under the FMLA.


In her amended complaint, the plaintiff claims that

the defendant misinformed her of her FMLA rights and informed

her that FMLA was permitted only if her medical leaves were

habitual. *Doc. 17 at ¶¶21-23 & 36.*  We assume that the

plaintiff was allegedly told this after her February 22, 2008

absence.


_____

18. Although we conclude that the defendant is entitled to
summary judgment on the plaintiff's interference claims to the
extent that they are based on the plaintiff's March 5th request
for FMLA paperwork, the plaintiff's March 5th request for FMLA
paperwork is also part of her FMLA retaliation claim.  As
discussed below, we do not conclude that the defendant is entitled
to summary judgment on the plaintiff's FMLA retaliation claim.

86

The defendant contends that at her deposition the plaintiff was unable to explain what she meant by her allegation that she was misinformed that FMLA leave is permitted only if medical leave is habitual.  The plaintiff has not responded to this contention.  Thus, we conclude that the defendant is entitled to summary judgment on the plaintiff's claim that she was misinformed by being informed that FMLA was permitted only if medical leave is habitual.

The plaintiff also claims in her amended complaint that the defendant misinformed her of her FMLA rights.  In her brief in opposition to the defendant's motion for summary judgment, the plaintiff contends that the defendant misinformed her of her FMLA rights by telling her that if she were to be absent for any reason she "needed FMLA to back it up." *Doc. 31-2 at 49.*  The plaintiff, however, fails to explain how the defendant telling her that she "needed FMLA to back" up her absences misinformed her of her FMLA rights.  The FMLA contains a provision which entitles employers to request medical certification from an employee requesting leave. 29 U.S.C.S. § 2613(a).  Thus, the fact that the defendant informed the

87

plaintiff that she needed the submit the company's FMLA
paperwork to support her absences can not be seen as
interference with her FMLA rights.  Accordingly, we will
recommend that the defendant be granted summary judgment on the
plaintiff's FMLA interference claim based on the plaintiff
allegedly being misinformed of her FMLA rights.

The plaintiff also claims in her amended complaint that
the defendant interfered with her FMLA rights by terminating
her when it became aware that she intended to exercise her
rights under the FMLA. *Doc. 17 at ¶37.*  "[F]iring an employee
for a valid request for FMLA leave may constitute interference
with the employee's FMLA rights as well as retaliation against
the employee." *Erdman v. Nationwide Ins. Co.,* 582 F.3d 500, 509
(3d Cir. 2009).  However, as discussed above, the plaintiff
testified that on March 5th she was not requesting FMLA leave
but was only getting the paperwork for the future.  Thus, we
conclude that the plaintiff's contention that she was
terminated and ultimately suspended because of her March 5th
request for FMLA paperwork is more appropriately analyzed as an
FMLA retaliation claim rather than an FMLA interference claim.

88

In her brief in opposition to the defendant's summary judgment motion, the plaintiff sets forth additional ways the defendant allegedly interfered with her FMLA rights. The plaintiff contends that the defendant interfered with her FMLA rights by failing to designate her February 22, 2008 absence as an absence under the FMLA, by failing to inquire further about or obtain additional information about the February 22, 2008 absence to determine whether it was an FMLA absence, by failing to provide the plaintiff with individualized notification of her rights and obligations under the FMLA with respect to her February 22, 2008 absence, by assigning the plaintiff a point or occurrence under the attendance policy for the February 22, 2008 absence thereby resulting in the plaintiff being ineligible for a perfect attendance award and by attempting to discourage the plaintiff from taking absences by informing her that the company was attempting to rid itself of employees who take FMLA. *Doc. 31-2 at 49 & 50.*

The defendant contends that the plaintiff is attempting to amend her complaint through her brief in opposition to the summary judgment motion to add additional claims. The

89

defendant asserts that the plaintiff had not pleaded the interference claims set forth above in her amended complaint and, thus, those claims are not properly before the court.  The defendant asserts that, if the plaintiff is permitted to proceed on these claims, the court should reopen discovery and allow it to take additional discovery relating to those new claims.  The plaintiff responds that she has not set forth new causes of action in her brief but that she simply set forth additional arguments in support of her interference claims.

We agree with the defendant that the interference claims set forth in the plaintiff's brief raise new claims, that the plaintiff may not amend her complaint through her brief and that, therefore, the additional claims set forth by the plaintiff in her brief are not properly before the court. Accordingly, we do not address those claims.

In sum, we will recommend that the defendant be granted summary judgment on the plaintiff's FMLA interference claims.

90

2. Retaliation Claim.

The plaintiff claims that the defendant retaliated against her by suspending and then terminating her employment after it became aware that she intended to exercise her rights under the FMLA.

"Employers may not 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Callison, supra,* 430 F.3d at 119 (quoting 29 C.F.R. § 825.220(c)). Retaliation claims under the FMLA are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). *Bearley v. Friendly Ice Cream Corp.,* 322 F.Supp.2d 563, 571 (M.D.Pa. 2004). As discussed in connection with the plaintiff's Title VII retaliation claim, the *McDonnell Douglas* framework has three steps: (1) the plaintiff bears the burden of establishing a prima facie case; (2) the burden then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action; and (3) if the defendant satisfies this burden, the plaintiff must then come forth with

91

evidence indicating that the defendant's proffered reason is merely a pretext. *Id.*

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that: (1) she invoked FMLA rights; (2) she suffered an adverse employment action; and (3) a causal connection exists between the adverse action and the plaintiff's exercise of her FMLA rights. *Bearley, supra,* 322 F.Supp.2d at 571; *Erdman, supra,* 582 F.3d at 509 (holding that "invocation of FMLA rights, not actual commencement of leave" sufficient to satisfy first element of a *prima facie* case).

Invocation of FMLA Rights.

The defendant contends that the plaintiff can not establish the first element of a *prima facie* FMLA retaliation claim because there is no evidence that the plaintiff availed herself of a protected right under the FMLA.  We disagree.

The plaintiff has presented evidence that with regard to her February 22, 2008 absence she invoked the FMLA. *See Doc.*

*32-30 at 2* (stating on the coaching sheet for that absence: "Doctor's excuse - if you want I will get a FMLA."). Also, there is evidence that, on March 5, 2008, the plaintiff went to Human Resources Assistant Cynthia Fultz and obtained FMLA paperwork. *Doc. 27 at ¶245 of Defendant's Proposed Findings of Fact and Doc. 31 at ¶245 of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts.* As discussed above, the plaintiff's testimony was that on March 5th she was not currently requesting FMLA leave but was only getting the paperwork for the future. We concluded above that, since the plaintiff was not requesting FMLA leave for any particular date, she failed to establish an interference claim. Nevertheless, there is evidence that she requested FMLA paperwork. Construing the evidence in the light most favorable to the plaintiff, as we must when deciding a summary judgment motion, we conclude that there is evidence to reasonably support an inference that the plaintiff invoked FMLA rights.

93

Causation.

The defendant contends that the plaintiff can not establish the third element of a *prima facie* FMLA retaliation claim because the plaintiff cannot establish a causal connection between her invocation of FMLA rights and her suspension and termination.

For the reasons discussed above in connection with the plaintiff's Title VII retaliation claim, we conclude that the plaintiff has presented evidence to reasonably support an inference of causation.  In sum, we conclude that based on the evidence presented by the plaintiff regarding the timing of her suspension and termination in relationship to her request for FMLA paperwork, regarding the inconsistent reasons given by the defendant for her suspension and regarding pretext, the plaintiff has presented evidence from which a reasonable fact finder could find a causal connection between her request for FMLA paperwork and her suspension and termination.

94

We note with regard to the causation element that the defendant contends that those individuals who made the decisions to suspend and to subsequently terminate the plaintiff's employment did not know that the plaintiff suffered a serious medical condition.  There is no evidence that Camp or O'Neill knew either that the plaintiff had a serious medical condition or that she invoked the FMLA.  However, there is evidence that the plaintiff informed Kauffman that she had anxiety and depression and that the medications that she was taking to try to regulate those conditions could cause drowsiness. *Doc. 32-4 at 45 (page 143 of Treaster Dep.).*  There is also evidence that on the coaching memo issued by Kauffman, the plaintiff wrote: "Doctor's excuse - if you want I will get a FMLA." *Doc. 32-30 at 2.*  Further, there is evidence that Long was informed that the plaintiff had requested FMLA paperwork. *Doc. 32-29 at 2.*  Given that there is evidence that Kauffman and Long were aware of the plaintiff's invocation of the FMLA and that they were involved in the decisions to suspend and then terminate the plaintiff's employment, we conclude that the defendant is not entitled to summary judgment on the basis of lack of causation. *See generally Abramson v. William Patterson*

95

*College of New Jersey,* 260 F.3d 265, 286 (3d Cir. 2001)(stating that "[u]nder our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.").

    As discussed above in connection with the plaintiff's Title VII retaliation claim, the defendant has articulated a legitimate nondiscriminatory reason for suspending and then terminating the plaintiff's employment - the plaintiff's purported threats to Shelley.  Also, however, as set forth above, the plaintiff has presented evidence from which a reasonable trier of fact could conclude that the defendant's purported reason was pretext.  Accordingly, we conclude that the defendant is not entitled to summary judgment on the plaintiff's FMLA retaliation claim.

C.  ADA and PHRA Claims.


The amended complaint contains discrimination and retaliation claims under the ADA and PHRA.[19]


1. Discrimination.


The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[20]  Where there is no direct

---

[19].  An "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 306 (3d Cir. 1999).  Accordingly, we will only discuss the plaintiff's ADA claims because our analysis of those claims is coterminous with the PHRA claims. *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 761 n.6 (3d Cir 2004).

[20].  The ADA was amended in 2008 and those amendments took effect on January 1, 2009.  ADA Amendments Act of 2008, Pub.L.No. 110-325, 122 Stat. 3553, 3553-59.  The events at issue in this case occurred prior to the effective date of the amendments.  The parties do not argue that the amendments have retroactive effect. Accordingly, we will not apply the amendments.

evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies to an ADA discrimination claim.

To establish a *prima facie* case of discrimination under the ADA, the plaintiff must demonstrate that she: 1) has a disability; 2) is a qualified individual; and 3) has suffered an adverse employment decision as a result of her disability. *Skerski v. Time Warner Cable Co.,* 257 F.3d 273, 278 (3d Cir. 2001). "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville School District,* 184 F.3d 296, 306 (3d Cir. 1999).

Under the ADA, an individual has a disability if he or she: (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2).

98

Actual Disability.

The plaintiff contends that she meets the first prong of the ADA's definition of disability because she has a mental impairment that substantially limits her major life activities.

In order "'to establish a statutorily protected disability, the employee must show that she has an impairment; identify the life activity that she claims is limited by the impairment; and prove that the limitation is substantial.'" *Colwell v. Rite Aid Corp.,* __ F.3d __, 2010 WL 1376301 at *3 (3d Cir. Apr. 8, 2010)(quoting *Fiscus v. Wal-Mart Stores, Inc.,* 385 F.3d 378, 382 (3d Cir. 2004)).

Dr. Galvin states in her affidavit that she diagnosed the plaintiff, in October of 2007, with panic disorder, which is a mental illness that can involve stress, anxiety and/or panic attacks and that she continues to treat the plaintiff for panic disorder. *Doc. 32-27 at ¶¶10 & 11.* Given Dr. Galvin's affidavit, the plaintiff has presented evidence that she had an impairment.

99

The plaintiff contends her impairment substantially limited her major life activities of sleeping, concentrating, focusing, interacting with others, breathing, walking, sitting, talking, hearing and comprehending. *Doc. 31-2.*

The terms "major life activities" and "substantially limits" are defined in regulations promulgated by the Equal Employment Opportunity Commission (EEOC). EEOC regulations define "major life activities" for ADA purposes as: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). The EEOC regulations indicate that an individual's ability to perform an activity is "substantially limited" for ADA purposes if the individual is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

100

29 C.F.R. § 1630.2(j)(1).  A number of factors are relevant in determining whether an individual is substantially limited in a major life activity: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).  Although the term "substantially" in the phrase "substantially limits" suggests that it means "'considerable or to a large degree,' . . . the Supreme Court has made clear that '[t]he Act addresses substantial limitations on major life activities, *not utter inabilities.'" Emory v. AstraZeneca Pharmaceuticals LP.,* 401 F.3d 174, 179 (3d Cir. 2005)(italics in original)(quoting *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197 (2002) and *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998)).

     The plaintiff cites Dr. Galvin's affidavit in support of her contention that she was substantially limited in major life activities.  Dr. Galvin states that, during her treatment of the plaintiff, she concluded that the plaintiff's panic disorder affected the plaintiff's daily functioning including

but not limited to her ability to sleep, concentrate, focus and interact with others. *Doc. 32-27 at ¶12.* Dr. Galvin also states that, on February 21, 2008, the plaintiff communicated with Dr. Galvin that she was having difficulty sleeping due to panic attacks. *Id. at ¶16.* Dr. Galvin concluded that the plaintiff was experiencing sleep difficulties at least in part because of her panic disorder. *Id. at ¶17.* As a result, Dr. Galvin excused the plaintiff from work from February 21-22, 2008 due to her panic disorder. *Id. at ¶18.*

Dr. Galvin's affidavit supports an inference that the plaintiff's impairment affected the plaintiff's ability to sleep, concentrate, focus and interact with others. However, there is nothing in Dr. Galvin's affidavit that would reasonably support an inference that the plaintiff's ability to sleep, concentrate, focus or interact with others was substantially limited. As to the plaintiff's ability to concentrate, focus and interact with others, Dr. Galvin's affidavit contains no indication of the degree to which those activities of the plaintiff were limited. With respect to sleep, Dr. Galvin concluded that the plaintiff was experiencing

102

sleep difficulties and she excused the plaintiff from work on

February 21-22, 2008 due to the plaintiff's panic disorder.

However, Dr. Galvin's affidavit does not contain any indication

as to the duration or severity of the plaintiff's sleep

difficulties.  Accordingly, Dr. Galvin's affidavit does not

provide evidence from which a reasonable inference that the

plaintiff was substantially limited in a major life activity

can be drawn.


        The plaintiff also cites to her own deposition

testimony to support her contention that she was substantially

limited in major life activities.  When asked to state her

symptoms, the plaintiff testified:

> Get anxiety attacks, I feel like my
> heart is beating out of my chest, my
> legs start going, I start shaking and
> feel like everybody is against me,
> feel like I need to run, sometimes
> I've even sweat, depression, I want
> to hide, I don't want to do anything,
> sleep, don't care.

*Doc. 32-4 at 75-76 (pages 173-174 of Treaster Dep.).*  The

plaintiff also testified as follows about how her impairment

affects her:

Q: And if you could, I'm going to go over sort of a list of items to find out how this disability affects your daily activities. Can you take care of yourself?

A: Yes.

Q: Can you take care of your children?

A: Yes.

Q: And I know previously you mentioned that you take care of your mother as well?

A: Yes.

Q: Do you take care of your father?

A: Yes.

Q: Do you do your own food shopping?

A: Yes.

Q: Do you do your own clothes shopping?

A: No, because I can't pick out clothes for crap.

Q: Other than can't picking out clothes, is there anything that prevents you from getting clothes?

A: No.

Q: Okay, do you take a shower without any assistance?

A: Yes.

Q: Do you engage in some physical activity?

A: Yes.

Q: Does your conditions affect your ability to walk?

A: When I'm in the middle of a panic attack I walk in circles.

Q: Okay. Affect you ability to sit?

A: Yeah, I shake. I shake. I can't sit still.

Q: Stand?

A: I rock back and forth.

Q: Okay. Can you climb a ladder?

A: Yes, and I prefer not to.

Q: Okay. Fine. How about affecting your ability to talk?

A: When I'm in the panic attack, forget it.

Q: What do you mean?

A: I talk in circles.  I just ramble.  I try to get it through. I can't get out what I want to get out, how I want to get it out.

Q: How about working?

A: I can work.

Q: Okay.  Dress yourself?

A. Hum-hum.

Q: Drive?

A: Yes.

Q: How about affect your ability to see?

A: Not really.

Q: No. Okay.  How about your hearing?

A: When I'm in a panic attack, I kind of close up trying to sort through what's in my head that's making me go in circles.

Q: Okay.  But could you hear someone talking to you while you're in the middle of a panic attack?

A: Yeah, but I always can't comprehend what they're saying.

Q: Okay. How about breathing, does it interfere with your breathing?

A: Just rapid breathing.  It's almost like having a heart attack.

Q: And how long does the episode last? What's the duration?

A: It depends.

Q: Can you give me a range?

A: Lately they last about a minute or two. When I first started with them, they'd last like ten minutes because I didn't know what was going on, and I didn't know how to, you know . . .

Q: Affect your ability to eat?

A: I eat very well.

*Doc. 32-4 at 78-80 (pages 176-178 of Treaster Dep.).*

Construing the plaintiff's testimony in the light most favorable to the plaintiff, we nevertheless conclude that the testimony does not support a reasonable inference that the plaintiff's impairment significantly limited a major life activity of the plaintiff.  The plaintiff has pointed to no evidence regarding how often she suffers panic attacks and her testimony was that the panic attacks last only a couple of minutes at a time.  The plaintiff has failed to come forward with evidence creating a genuine issue of fact as to whether her ability to perform any major life activity is substantially limited.  Therefore, the plaintiff has failed to present evidence from which a reasonable trier of fact could conclude that she was actually disabled.

    Regarded as Disabled.

The plaintiff contends that she meets the third prong of the ADA's definition of disability because the defendant regarded her as disabled.

Under the third (regarded as) prong of the ADA's definition of disability, a person is "regarded as" having a disability if the person:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
> (3) Has [no impairment] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l)(1)-(3). "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." *Deane v. Pocono Medical Center*, 142 F.3d 138, 144 (3d Cir. 1998). However, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly, supra,* 94 F.3d at 109. The plaintiff must present evidence that the employer perceived her as substantially limited in a major

107

life activity. *Eshelman v. Agere Systems, Inc.,* 554 F.3d 426, 434 (3d Cir. 2009).

The plaintiff contends that the defendant regarded her as incapable of performing her job duties. *Doc. 31-2* at 67.  As support for that contention, the plaintiff contends: that she was repeatedly moved around to different positions despite not requesting such transfers; that Blewett admitted that the plaintiff's crying at work was a problem and that the plaintiff would be removed from the floor when she was crying; that when she returned after her February 22, 2008 absence, she was told that a doctor's note is not sufficient to excuse an absence and that she would need to get FMLA leave for such absences; and that she was suspended a mere two days after requesting FMLA paperwork. *Doc. 31-2 at 67.*

These contentions do not lead to a reasonable inference that the defendant regarded the plaintiff as unable to perform her job duties.  Moreover, "job duties" is not a major life activity.  To the extent that the plaintiff means that the

defendant regarded her as unable to work, she has not presented evidence to support that contention.

"[T]he definition of "substantially limits" remains the same as it does in other parts of the statute - i.e. if the individual is attempting to establish that the employer believed the individual to be limited in the life activity of "working" then "working" must encompass a broad class of jobs." *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 514 (3d Cir. 2001).

The plaintiff has pointed to no evidence that the defendant regarded her as unable to perform any particular job much less a broad class of jobs.  Accordingly, the plaintiff has failed to present evidence from which a reasonable trier of fact could conclude that the defendant regarded her as disabled.

Because the plaintiff has not presented evidence from which a reasonable trier of fact could conclude either that she was disabled or that the defendant regarded her as disabled, we

109

will recommend that the defendant be granted summary judgment

as to the plaintiff's ADA and PHRA discrimination claims.[21]


        2. Retaliation.


        The ADA contains an anti-retaliation provision.  The

ADA provides that "[n]o person shall discriminate against any

individual because such individual has opposed any act or

practice made unlawful by [the ADA] or because such individual

made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a).

"Thus, it is unlawful for an employer to retaliate against an

employee based upon the employee's opposition to anything that

is unlawful under the ADA." *Williams v. Philadelphia Housing

Auth. Police Dept.,* 380 F.3d 751, 758-59 (3d Cir. 2004).


        The burden-shifting analysis of *McDonnell Douglas*

applies to ADA retaliation claims. *Id.* at 759 n.3. "To

_____

21.  Because we conclude that the defendant is entitled to summary
judgment as to the plaintiff's ADA and PHRA discrimination claims
on the basis that the plaintiff has not presented sufficient
evidence that she was disabled or that the defendant regarded her
as disabled, we do not address the defendant's other arguments for
summary judgment on these claims.

establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997).

The defendant contends that the plaintiff can not establish a *prima facie* case because there is no evidence that the plaintiff engaged in protected activity.

The plaintiff contends that a request for a leave of absence for medical testing or care may constitute a request for a reasonable accommodation under the ADA, that a request for a reasonable accommodation is protected activity under the ADA and that she engaged in protected activity by requesting family and medical leave in February and March of 2008. The plaintiff, however, has not presented evidence that she requested an accommodation under the ADA. Although, as discussed above, she did invoke the FMLA in connection with her

111

February 22, 2008 absence and she did request and receive FMLA paperwork on March 5, 2008, the plaintiff has not presented any evidence that she informed anyone at the defendant that she was disabled or that she was seeking or requesting an accommodation under the ADA.  Accordingly, we conclude that the plaintiff has not presented evidence to support a reasonable inference that she engaged in protected conduct under the ADA.  Accordingly, we will recommend that the defendant be granted summary judgment on the plaintiff's ADA and PHRA retaliation claims.

V.  Recommendations.

Based on the foregoing, it is recommended that the defendant's motion (doc. 26) for summary judgment be granted in part and denied in part.  It is recommended that the defendant be granted summary judgment as to the plaintiff's Title VII hostile work environment claim (Count I of the amended complaint), the plaintiff's FMLA interference claims (Count III of the amended complaint) and the plaintiff's ADA and PHRA claims (Counts V through X of the amended complaint).  It is recommended that the defendant not be granted summary judgment

as to the plaintiff's Title VII retaliation claim (Count II of the amended complaint) and the plaintiff's FMLA retaliation claim (Count IV of the amended complaint).

*/s/ J. Andrew Smyser*
J. Andrew Smyser
Magistrate Judge

Dated:  April 29, 2010.

113